UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JOYCE PREBUL TEER,　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)　　　CIV. NO. 1:10-CV-251
　　　　　　　　　　　　　　　　)　　　(Collier/Carter)
MICHAEL J. ASTRUE,　　　　　　)
Commissioner of Social Security,　　)
　　　　Defendant.　　　　　　　)

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff's motion for judgment on the record (Doc. 11) and defendant Commissioner's motion for summary judgment (Doc. 15) are pending before the undersigned Magistrate Judge having been referred by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72 for a report and recommendation.

The primary issues before the undersigned are whether the ALJ erred in finding Plaintiff was not disabled as of December 31, 2003, the last date of insured status, from degenerative joint disease of the hips, status post bilateral hip replacement, lumbar degenerative disease and stenosis, bipolar disorder and an adjustment disorder with mixed anxiety and depression and whether the ALJ's finding that Plaintiff has the residual functional capacity for unskilled sedentary work activity that does not involve working with the general public is supported by substantial evidence. For the reasons stated herein, I RECOMMEND the Commissioner's decision be REVERSED and the case be REMANDED and benefits be AWARDED under Sentence Four of 42 U.S.C. § 405(g) as of March 15, 2001.

1

## II. Background

### A. Procedural History

Plaintiff applied for DIB on December 20, 2004, claiming she became disabled on March 15, 2001 (Tr. 124-26).[1] Plaintiff's insured status expired on December 31, 2003 (Tr. 127).[2] The Agency denied Plaintiff's claim initially and upon reconsideration (Tr. 110-16, 121-22 ). On November 24, 2006, ALJ Michael Swan issued a decision finding Plaintiff was not disabled (Tr. 79-86). On March 14, 2007, the Appeals Council remanded this case to the ALJ and directed the ALJ to give further consideration and explain the weight given to the opinion of Dr. Williams, further evaluate Plaintiff's subjective complaints in accordance with 20 C.F.R. § 404.1529, and further evaluate Plaintiff's mental complaints (Tr. 70-73). On November 27, 2007, ALJ Swan held another hearing, during which questions arose regarding a November 21, 2006, Report of Investigation completed by the Cooperative Disability Investigations Unit of the Agency's Office of the Inspector General (hereinafter referred to as "CDI report") (Tr. 823-38). Because neither Plaintiff nor her attorney was aware of the document, a continuance was granted (Tr. 837). Another hearing was held on March 25, 2008 (Tr. 839-70). On April 24, 2008, ALJ Swan found Plaintiff was not disabled because, given her residual functional capacity (RFC) for a range of sedentary work, she could perform a significant number of jobs in the economy (Tr. 16-28). The ALJ's decision became the final Agency decision when the Appeals Council denied review (Tr. 7-9). 20 C.F.R. §§ 404.955, 404.981.

---

[1] Plaintiff had previously filed for DIB in 2003, alleging an onset of disability in September 1999 (Tr. 108-09, 117-19, 248). That application was denied initially (Tr. 175).

[2] To be entitled to DIB, a claimant must show that she was disabled on or before the date her insured status expired. 20 C.F.R. § 404.131.

2

## B. Vocational Background

Plaintiff was 47 years old at the time her insured status expired and 51 years old on the date of the ALJ's decision (Tr. 124). She had a high school education and past work experience as a sales representative, construction manager, and an office assistant in a physician's office (Tr. 159-62, 167-71, 184).

## C. Issues Raised

1. The Defendant's credibility finding failed to follow the law and regulations directing what factors should appropriately be considered in evaluation of a claimant's subjective complaints.

2. The ALJ erred in rejecting the opinion of the treating physician.

3. The ALJ misstated the opinion of a consulting Psychological examiner and failed to give proper weight to a treating Psychologist.

## D. Relevant Evidence

<u>Plaintiff's Statements</u>

Plaintiff alleged disability due to bipolar disorder, bilateral hip replacements, and back surgery with fusion (Tr. 178). She alleged difficulty sitting, standing, walking, and lying on her back (Tr. 179). In February 2005, Plaintiff reported back pain and constant aching in her hips, which made it difficult to stand after sitting, climb stairs, and bend (Tr. 221-23). She also reported problems with lifting, sitting, standing, reaching, squatting, and kneeling, as well as problems with her memory, completing tasks, and concentrating (Tr. 218). Plaintiff described her daily activities as waking up, moving around to loosen her back, picking up around the house, getting dressed, going to therapy, showering and dressing, going to doctor visits, light cooking, and lying down (Tr. 213). She indicated she could perform light housework (Tr. 215),

3

and she shopped weekly for groceries and household items (Tr. 216). She indicated she was able

to pay bills, count change, handle a savings account, and use a checkbook (Tr. 216). She

reported her social activities included dinners and social gatherings (Tr. 217).

Plaintiff reported her pain medication made her drowsy and affected her concentration;

she also stated it gave her headaches and caused an upset stomach (Tr. 214, 218, 221).

On October 5, 2006, Plaintiff testified she last worked around 1997 (Tr. 795). She

underwent a right hip replacement in 1999, then did physical therapy for about five months (Tr.

796). She then had problems with her left hip, and in 2001, she had surgery on her left hip and

then went to physical therapy for six to seven months (Tr. 796). Subsequently, she began

experiencing back problems, and in May 2004, she had fusion surgery (Tr. 796). Plaintiff

testified surgery had not corrected her hip problem, and she still had problems walking up stairs

(Tr. 797-98). She also complained walking and stopping, such as she did at the grocery store,

caused back pain (Tr. 799). She testified that between March 2001, when she had left hip

surgery, and May 2004, when she had back surgery, she was unable to do any normal activities

(Tr. 800).

At the hearing in November 2007, the ALJ asked Plaintiff whether she had an opportunity

to review a CDI report, which was in the file (Tr. 823). Neither Plaintiff nor her attorney had

seen the report (Tr. 823). The ALJ indicated that, according to the report, the Agency had

received a call from one of Plaintiff's third party contacts, alleging Plaintiff was not disabled and

reporting various activities (Tr. 824). After Plaintiff reviewed the report, Plaintiff's stepfather,

Mr. Julius Greenwald, who was alleged to be the third-party involved, was called. After being

duly sworn, Mr. Greenwald denied he had contacted the Agency as indicated in the report (Tr.

4

828-29).  He thought Plaintiff's husband, who was in the process of divorcing his wife,  may

have been involved (Tr. 828-30).  Plaintiff denied recalling that an investigator had been to her

house and carried out activities described in the CDI report (Tr. 831-35).  She did, however,

acknowledge that the signature on the CDI report discussing a photo line-up was hers, although

she did not know how it got on the document (Tr. 835-36).  The ALJ continued the hearing in

order for Plaintiff to further investigate the authenticity of the report and to allow her to review

the contents of the report (Tr. 837).

Another hearing was held on March 25, 2008 (Tr. 839-70).  When questioned about the

CDI report at this hearing, Plaintiff indicated that she recalled an investigator coming to her

house, and she proceeded to describe their interaction in detail (Tr. 845-48).  She told the ALJ

that, at the previous hearing, she had been very confused as the report had caught her off guard,

and that was why she did not recall the contact with the investigator  (Tr. 846-47).

Plaintiff testified that, since the last hearing, she had been hospitalized for ten or eleven

days and was released in the care of her daughter (Tr. 849).  Plaintiff testified that she currently

lived with her daughter (Tr. 852).  She noted that after being released from the hospital, she saw

a psychiatrist, Dr. Nickie Soufleris, and a psychologist, Dr. Vidrine (Tr. 850).

Medical Evidence

*Mental*[3]

On November 4, 2003, Benjamin Biller, M.S., in conjunction with James Trevor

Milliron, Ph.D., performed a consultative psychological examination of Plaintiff (Tr. 347-51).

---

[3] Plaintiff indicated she saw Dr. Spaulding, a psychiatrist, every week since 1997 or 1998
(Tr. 195).  Dr. Spaulding's treatment notes are not in the record, and the ALJ noted that he had
refused to forward them to Dr. Vidrine, nor had he submitted them to the Agency (Tr. 22).

5

Mr. Biller reported that Plaintiff appeared to have a significant level of depression and anxiety (Tr. 351). He diagnosed bipolar disorder, managed with medications, and an adjustment disorder with mixed anxiety and depressed mood (Tr. 351). He opined that she appeared to have the ability to understand and remember locations and work-like procedures, understand and remember simple and/or detailed instructions, adapt to changes in the work environment and to be aware of hazards and travel unaccompanied in unfamiliar places or use public transportation (Tr. 351). However, she did not appear to have the ability to sustain concentration and be persistent with work processes, due to physical pain and short-term memory problems (Tr. 351). He opined that Plaintiff's problems were primarily physical (Tr. 352). She did not appear to posses the ability to interact with peers and supervisors in a standardized work setting due to bipolar disorder (Tr. 351).

On November 28, 2003, a state agency medical consultant reviewed the record, including Mr. Biller's report, and opined Plaintiff had an affective disorder and an adjustment disorder, which resulted in mild limitations in daily activities and moderate limitations in social functioning and concentration, persistence, or pace (Tr. 363-375). The medical consultant completed a Mental RFC Assessment and opined Plaintiff was able to sustain persistence and pace over extended periods for simple tasks and detailed tasks with some difficulty at times, but still could do it, and she was able to interact with the general public with some difficulty at times, but could still do it (Tr. 379). The medical consultant noted no limitations in understanding and memory or adaptation (Tr. 377-79).

On March 29, 2005, Carol Phillips, Ed.D., performed a psychological evaluation of Plaintiff (Tr. 409-11). On mental status examination, Plaintiff was oriented; her recall of events

6

in immediate, recent, and remote spheres was intact; she computed serial sevens; she was able to count backward from twenty to one; she performed simple calculations; she recalled six digits recited in the forward direction; she accurately identified the current and past presidents, the flag colors, the date, her age/birthdate, and social security number; her thoughts were clear and lucid, but she offered many tangential and circumstantial comments (Tr. 410). She had difficulty being directed to or away from a subject, and she made comments that appeared to be a function of her anxiety, bipolar symptoms, and a personality disorder (Tr. 410). Dr. Phillips diagnosed bipolar disorder and borderline personality disorder (Tr. 411). She opined Plaintiff's ability to understand and recall simple work functions was not impaired; her ability to concentrate and be persistent for work tasks was mildly to moderately impaired; social interactivity patterns were mildly impaired; and adapting to changes and requirements in routine or work settings was mildly to moderately impaired (Tr. 410).

On July 17, 2007, David Caye, M.S., a clinical psychologist, performed a psychological evaluation (Tr. 783). He diagnosed a mood disorder, NOS; a personality disorder, NOS, with histrionic and narcissistic traits (Tr. 788). He reported that Plaintiff was free of signs of major mood disorder during the office visit, cheerful, smiling, interacting socially quite freely and clearly engaging in attention getting behaviors (Tr. 788). He opined that Plaintiff had no limitations in her ability to understand, remember, and carry out even complex instructions; mild limitation in her ability to interact appropriately with the public and co-workers; moderate limitation in her ability to interact appropriately with supervisors and to respond appropriately to usual work situations and changes in routine work setting (Tr. 789-90).

On June 21, 2007, Davelyn Vidrine, Ph.D., wrote a letter indicating Plaintiff's daughter

7

had been functioning as Plaintiff's caretaker for about the past four weeks because Plaintiff needed to have a temporary net of safety due to bipolar disorder which had recently intensified (Tr. 774). Dr. Vidrine testified she had treated Plaintiff briefly in 2006, and treated her regularly since June 2007 (Tr. 861) and could testify about Plaintiff's mental status before December 31, 2003 (Tr. 861). She knew Plaintiff was being treated for bipolar disorder and had been medicated for a significant period of time for bipolar disease, based on Plaintiff's reports to Dr. Soufleris and to her (Tr. 862). Dr. Vidrene noted she had not been able to review any of Plaintiff's psychological or psychiatric records during her treatment with Dr. Spalding (Tr. 863). She indicated her opinion was based on information provided to her by Plaintiff regarding her diagnosis and medication that she was on and/or information provided by Plaintiff's family (Tr. 863-64). She testified that in December 2003, Plaintiff's functioning would have been labile, that she would have had great difficulty holding her emotions together so that she could act in a self initiating manner (Tr. 863). Also, Plaintiff's history of interpersonal relationships was labile, subject to regressions, mainly in the form of rage (Tr. 864). Her impulse control was poor (Tr. 864). She opined that, prior to December 2003, normal activities of daily living would have been compromised under certain conditions of stress (Tr. 864). Dr. Vidrine indicated she had been able to review a list of medications that Plaintiff was taking prior to December 2003 (Tr. 864). Dr. Vidrine opined Plaintiff was an accurate historian, and that the history that she provided was credible and accurate and corroborated by her work with Plaintiff's family (Tr. 965).

*Physical*

Prior to the date of her alleged onset of disability (March 14, 2001), Plaintiff was diagnosed with severe right hip degenerative joint disease (Tr. 272-73). On June 10, 1999, she

8

underwent a total right hip replacement (Tr. 272-94). On June 30, 1999, three weeks after her

right hip replacement, Plaintiff indicated her pain had improved (Tr. 540). On examination, her

wound was well-healed, there was no sensory or motor deficit, there was no evidence of deep

vein thrombosis (DVT), and hip motion was supple without pain (Tr. 540). Timothy Ballard,

M.D., Plaintiff's orthopedic surgeon (Chattanooga Orthopaedic Group), indicated she was

"[d]oing well" (Tr. 540). A subsequent treatment note on July 28, 1999, indicated that Plaintiff

improved after the surgery, her wound was well-healed, and she was advised to advance

activities as tolerated (Tr. 539-40).

Subsequently, Plaintiff's left hip pain worsened, and she was found to have severe

degenerative joint disease in the left hip (Tr. 306). On March 19, 2001, she underwent a total left

hip replacement (Tr. 304-14, 536, 538). By April 9, 2001, Plaintiff indicated her pain had

improved substantially (Tr. 535). On examination, the wound was well-healed, there was no

sensory or motor deficit, there was no evidence of DVT, and hip motion was supple without pain

(Tr. 535). Dr. Ballard indicated Plaintiff was "[d]oing well," and she was advised to continue to

advance activities as tolerated (Tr. 535). Plaintiff attended physical therapy after her left hip

replacement (Tr. 328-41), and, according to a therapy note dated June 22, 2001, Plaintiff had

made great progress and walked without a limp and had good range of motion (Tr. 341). On July

31, 2001, Plaintiff indicated her hip was "doing much better, finally" (Tr. 534). At a follow-up

appointment on October 29, 2001, Dr. Ballard reported the same objective findings, and

continued to advise Plaintiff to perform activities as tolerated (Tr. 533).

On January 30, 2002, Plaintiff reported some problems flexing her left hip (Tr. 532). She

walked with a mild antalgic gait, had tenderness in the left groin, and painful active extension on

the left (Tr. 532). Dr. Ballard recommended physical therapy, instructed Plaintiff to take Aleve as needed, and continue to advance activities as tolerated (Tr. 532, 765). On April 19, 2002, Bo Watson, a physical therapist, stated that Plaintiff had responded well and reported that her left hip pain, although not completely gone, was much better (Tr. 337).

On October 23, 2002, Plaintiff complained of left calf pain (Tr. 531). On examination, she had calf tenderness and some left hip flexor weakness (Tr. 531). Dr. Ballard assessed a partial left gastroc tear and recommended physical therapy, which Plaintiff began in November (Tr. 336, 531, 761). On November 20, 2002, Plaintiff complained of pain in the left groin area, but indicated that her right hip pain had completely resolved (Tr. 530). Plaintiff had some tenderness to the left groin, and Dr. Ballard continued Plaintiff's physical therapy (Tr. 530, 762).

On April 7, 2003, Plaintiff reported that her right hip was doing great, and although her left hip was improving, it hurt to flex (Tr. 529). She indicated she walked fine, but sometimes had difficulty climbing stairs (Tr. 529). Dr. Ballard assessed Plaintiff as "[d]oing well status post bilateral total hip replacements, left hip with flexor tendinitis, improving" (Tr. 529).

On August 18, 2003, Plaintiff underwent nerve conduction studies and electromyography (NCS/EMG) because of pain and numbness in her left leg (Tr. 546). The results indicated left femoral cutaneous nerve neuropathy causing pain along the anterior and lateral aspects of the left thigh with decreased sensation to pinprick stimulation and generalized peripheral neuropathy (Tr. 547). An MRI on that date indicated levoscoliosis of the lumbar spine with associated degenerative changes, particularly at the L5-S1 level; degenerative disc disease and left disc protrusion and osteophyte at the L5-S1 level resulting in marked to severe stenosis, moderate stenosis of the L4-5 nerve root, and mild stenosis of the bilateral nerve root foramen at the L3-4

10

level (Tr. 545). On examination of the lumbar spine, Plaintiff had some tenderness in the left lower back with equivocal straight leg raise (Tr. 527). Dr. Ballard considered an x-ray examination which revealed severe L5-S1 degenerative joint disease with scoliosis (Tr. 527). He assessed left lower lumbar radiculopathy and recommended Plaintiff follow up with Craig Humphrey, M.D. (Tr. 527).

On September 16, 2003, Plaintiff was seen at Chattanooga Orthopaedic Group (it appears she was seen by Kurt Pulver, P.A.) (Tr. 523-24). She indicated that about a month earlier, she had been helping her daughter move and performed some repetitive bending, and, since that time, she had pain in her low back area radiating into her left leg (Tr. 523). She also reported occasional numbness in her left foot (Tr. 523). Also on that date, Thomas Devlin, M.D., Ph.D., a neurologist, evaluated Plaintiff (Tr. 344-46). According to his note, a few weeks earlier, Plaintiff was "bending over and doing semi-strenuous activities in the house" and developed acute back pain which radiated into the left leg (Tr. 344). He reviewed Plaintiff's MRI report (Tr. 344). On examination, Plaintiff's motor and sensory examinations were normal (Tr. 345). Her gait and station were normal (Tr. 346). Her reflexes were 2+ bilaterally throughout, and straight leg testing was negative (Tr. 346). Dr. Devlin indicated Plaintiff's symptoms were classic for sciatic nerve pain (Tr. 346). He doubted if her pain was due primarily to a hip problem (Tr. 346). Dr. Devlin started Plaintiff on Neurontin; he noted she was already scheduled for physical therapy (Tr. 346)

On September 22, 2003, Dr. Humphrey indicated Plaintiff had good range of motion, good muscle tone, normal Achilles and patellar reflexes, intact sensation, and smooth and steady ambulation (Tr. 522). He reviewed the MRI results and diagnosed degenerative changes at L5-

11

S1, disc protrusion at L5-S1, lumbar spinal stenosis of L3-4 and L4-5 with disc protrusions at these levels (Tr. 522).

Treatment notes from Henry Williams, M.D., Plaintiff's primary care physician, indicate that, between 1991 and December 31, 2003, Dr. Williams treated Plaintiff for various acute conditions (see generally Tr. 477-86). In addition, according to a treatment note dated September 29, 2003, Plaintiff complained of back pain and, and Dr. Williams diagnosed L4-5 foraminal spinal stenosis, severe left radiculopathy, and bipolar disorder (Tr. 477).

At a follow-up with Dr. Devlin on October 9, 2003, Plaintiff continued to complain of significant back pain. His impression was multi-level radiculopathy with significant back pain. Dr. Devlin noted Plaintiff was scheduled to see Dr. Caitlin for a steroid injection and was seeing Dr. Pierce and may need lumbar surgery (Tr. 343).

According to a therapy note from Bo Watson, dated November 16, 2003, Plaintiff had undergone an epidural steroid injection for her back problem, and she reported she was doing "very much better." She noted her general strength was weak since onset of leg pain (Tr. 741). Mr. Watson indicated Plaintiff was much improved following an epidural steroid injection, but she was generally deconditioned (Tr. 742). He indicated a short term goal as increased activity (Tr. 742).

On November 25, 2003, Robert Burr, M.D., a state agency physician, reviewed the record including Plaintiff's bilateral hip replacements (Tr. 356). He opined that her complaints of pain were credible, and she would be able to lift 10 pounds occasionally and less than 10 pounds frequently; stand/walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance,

12

stoop, crouch, kneel, and crawl (Tr. 355-62).

The medical evidence after Plaintiff's insured status expired includes Dr. Williams'
treatment notes, indicating that Plaintiff continued to complain of back pain on February 10 and
March 30, 2004 (Tr. 474-75).  Physical examinations indicated abnormal palpitations (Tr. 474-
75).

Based on Plaintiff's failure to improve with conservative treatment, Plaintiff underwent
posterior segmental spinal instrumentation of L3 to S1 with a fusion and local bone graft and
prosthetic implants and a posterior spinal fusion on May 26, 2004, performed by Richard Pearce,
M.D., an orthopedist (Tr. 382-87, 454).  He ordered physical therapy in June 2004 (Tr. 729).

By July 15, 2004, Plaintiff indicated 40 percent improvement in her symptoms compared
to before surgery and reported her preoperative left leg radiculopathy had resolved (Tr. 442-43).
On examination, Plaintiff had a normal gait, negative straight leg raising bilaterally, and motor
and sensory examination of the lower extremities was intact (Tr. 442).  Subsequently, on August
26, 2004, Dr. Pearce reported Plaintiff continued to make positive progress but noted continued
right hip and thigh pain (Tr. 441).

Although subsequent treatment notes indicate that Plaintiff still experienced back pain
(Tr. 431, 433-38, 599), x-rays indicated that there was no loosening of her internal fixation, and
her fusion continued to look solid (Tr. 427, 430, 432, 611).  And, in February 2005, Dr. Pearce
indicated she was doing well from her spine standpoint,  but noted in his Diagnosis of the
Lumbar /Sacral Spine the following conditions:  Spondylosis, Degenerative Lumbar Scoliosis,
Facet Arthropathy, Degenerative Disc Disease L5-S1, Low Back Pain, Radiculitis/ leg pain left
lower extremity and Lumbar Radiculopathy on the left at L5 (Tr. 434).  According to physical

therapy notes from Hans Humberger in 2006, Plaintiff experienced improvement in her groin, hip, and back pain with treatment (Tr. 608–10).

Treatment notes after Plaintiff's date last insured also show that she was treated for ankle/foot swelling in 2005 (Tr. 472), and intermittent bursitis between 2004 and 2006 (Tr. 509-10, 595). She also sought treatment for various acute conditions (see e.g. 498-99, 503, 559-61, 565-73, 587).

On April 5, 2005, Joe Allison, M.D., state agency physician, reviewed the evidence, including Plaintiff's history of right and left hip pain, prior to her alleged onset date, as well as various medical records from 2001 to 2004, which included Plaintiff's complaints of back pain (Tr. 414-15). He considered her statements regarding her hip pain and back pain (prior to her date last insured) to be credible and, based on such, opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand/walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs; balance; stoop; crouch; kneel; and crawl (Tr. 412-18).

On June 8, 2005, Dr. Williams submitted a medical assessment in which he listed restrictions that would render Plaintiff disabled (Tr. 621). He opined Plaintiff could sit for four hours in an eight hour day and stand or walk for two to three hours (Tr. 621). She could occasionally lift up to five pounds and infrequently (a few times a day) lift up to ten pounds (Tr. 621). She would require one hour of bedrest during a workday (Tr. 622). She would require more than one thirty minute break and two fifteen minute breaks (Tr. 622). He opined she could not be reasonably expected to be reliable in attending an eight hour a day, forty hour a week job (Tr. 622). He opined Plaintiff's pain, medical condition, or medication would cause a lapse in

14

concentration or memory every several hours three or more days per week (Tr. 622). He stated that Plaintiff had significant chronic pain in the hip girdle area and back, with leg weakness and mobility problems, requiring pain medication, which seemed to preclude gainful employment (Tr. 623). Dr. Williams also indicated that Plaintiff had this same level of limitation prior to her date last insured (Tr. 620).

On July 2, 2007, Dr. Williams submitted a letter clarifying his opinion (Tr. 776). He indicated that he had considered his medical records from 2003 to 2005, records from other doctors, and test results (Tr. 776-77). He summarized that Plaintiff had severe disease in the lower back and legs since at least 2003, and it was difficult to see how she could have engaged in gainful employment (Tr. 777). He also reiterated that the limitations contained in his medical source statement related back to Plaintiff's date last insured (Tr. 776-77, 779).

<u>Vocational Expert Testimony</u>

The ALJ asked the VE to assume an individual with Plaintiff's vocational profile, who had the RFC to perform a full range of unskilled sedentary work with rare to no contact with the general public, who needed a job that was low stress, which was defined as occasional decision making and occasional changes in the work setting (Tr. 866). The VE testified the individual would not be able to perform Plaintiff's past work (Tr. 866). The VE testified the individual could perform about two-thirds of the 137 job titles in the unskilled, sedentary category (Tr. 866). He gave, as examples, the job of bench hand (1,400 jobs in the region and 350,000 nationally), finisher (640 in the region and 250,000 nationally), and patcher (420 in the region and 114,000 nationally) (Tr. 866-67).

<u>Standard of Review - Findings of the ALJ</u>

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the claimant makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner

16

are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842,

92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th

Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the

Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir.

1971). The Court may not reweigh the evidence and substitute its own judgment for that of the

Commissioner merely because substantial evidence exists in the record to support a different

conclusion. The substantial evidence standard allows considerable latitude to administrative

decision makers. It presupposes there is a zone of choice within which the decision makers can

go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994)

(citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and*

*Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security
Act through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity during the period
from her alleged onset date of March 15, 2001 through her date last insured of
December 31, 2003 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe
impairments: degenerative joint disease of the hips, status post bilateral hip
replacement; lumbar degenerative disease and stenosis; bipolar disorder; and an
adjustment disorder with mixed anxiety and depression (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or
combination of impairments that met or medically equaled one of the listed
impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that through the date last
insured, the claimant had the residual functional capacity to perform sedentary

work as defined in 20 CFR 404.1567(a) so long as that work was unskilled, low stress, and did not involve working with the general public.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on xxxxxxx x, 1956 and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2001, the alleged onset date, through December 31, 2003, the date last insured (20 CFR 404.1520(g)).

(Tr. 19-28).

### III. Analysis

Plaintiff raises three points which I conclude have merit, as set out below. Looking at the record as a whole, I conclude an award of benefits is the proper result in this case which I will recommend.

### The Credibility Assessment:

Plaintiff first argues the ALJ's credibility finding failed to follow the law and regulations directing what factors should appropriately be considered in evaluation of a claimant's subjective

18

complaints. This case was remanded from the Appeals Council with specific instructions to give further consideration to the treating source opinion and to evaluate Plaintiff's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529), pertinent circuit case law and Social Security Ruling 96-7p (Tr. 72)

As Ruling 96-7p indicates, when additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. (e.g. *see* Social Security Ruling 96-7p, 20 C.F.R. § 404.1529(c) and 416.929(c) for other factors).

19

In determining whether a Plaintiff is disabled, the Defendant is to consider all of a Plaintiff's symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and *other* evidence. 20 C.F.R. § 404.1529(c)(3) and 416.929(c)(3). Other evidence includes the claimant's own statements, statements from the claimant's treating or non-treating physicians, and others *about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect her ability to work. Id.* Statements about pain alone do not establish disability-"there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of ... pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled." *Id.*

In this case, the ALJ finds *all* Plaintiff's testimony lacking in credibility because of a finding that Plaintiff made contradictory statements regarding a fact unrelated to her disability, the objective medical evidence, or the associated subjective symptoms and limitations. The credibility of the Plaintiff's testimony in its entirety is dismissed because, when unexpectedly confronted with a report from a CDI investigator, a report she had never seen, she testified she had absolutely no memory of meeting with an investigator posing as a law enforcement officer investigating an identity theft case (Tr. 831 and 835-837). After reporting no recollection of the meeting with the investigator, the hearing was postponed for the Plaintiff to have time to

20

investigate the facts surrounding the allegations and to review the details of the investigative report (Tr. 837). During the subsequent hearing the Plaintiff testified that she did remember (in some detail) the visit by the investigating officer (Tr. 845-849). When the ALJ confronted her with her prior denial of meeting with the officer the Plaintiff responded "I may, at the very first, have been confused. But afterwards, yes." On the basis of the Plaintiff's testimony regarding an investigation that did not result in any evidence contrary to her claim for disability or relevant to any other facts material to her claim for benefits, the ALJ found all Plaintiff's other testimony to be lacking in credibility. The first hearing was on November 29, 2007, about a year after the investigation, the second hearing was March 25, 2008 (Tr. 820,839). At the first hearing, the ALJ asked her questions about an event involving a person identifying himself as an investigator looking into an "identity theft ring" (Tr. 93). As noted above, she had never seen any report of this conversation and claimed she did not recall it at all. I conclude it is significant that one of her medical conditions, Bi-Polar disorder, was being treated with various medications. At times she was over-medicated and she was previously diagnosed by State Agency Psychologists Benjamin Biller and James Trever Milliron, Ph.D. with the inability to sustain concentration due to physical pain and was found to have short term memory problems (Tr. 351). At the second hearing, after reviewing the report, she remembered the event in detail.

This investigation began because of a phone call from someone who identified himself as the Plaintiff's step-father. At the November 29, 2007 hearing, Plaintiff's step-father, Mr. Greenwald, was called and placed under oath. He swore that he never made such a call but suspected it could have been Plaintiff's husband because they were going through a divorce. Thus, we have in this case an anonymous call of uncertain origin.

A significant consideration in the evaluation of pain is the credibility of the claimant, given that tolerance of pain is very much an individual matter. *Villareal v. Secretary,* 818 F.2d 461, 463 (6th Cir.1987). "Determination of credibility related to subjective complaints of pain rests with the ALJ and the ALJ's opportunity to observe the demeanor of the claimant ... is invaluable and should not be discarded lightly." *Gaffney v. Bowen,* 825 F.2d 98, 101 (6th Cir.1987). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir.1997). An "ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." *Moon v. Sullivan,* 923 F.2d 1175, 1183 (6th Cir.1990). Stated another way, "discounting credibility *to a certain degree* is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and **other evidence**." *Walters v. Commissioner,* 127 F.3d 525, 532 (6th Cir.1997) (emphasis added).

In this case the ALJ accurately recited the legal requirement that the above listed factors be considered *in addition to* the objective medical evidence. He then appeared to ignore those factors, and proceeded to focus on one single element of the Plaintiff's testimony to the exclusion of the statutory requirements. I agree with the argument made by Plaintiff. The cited inconsistencies in the Plaintiff's testimony do not relate to a fact or facts that are probative of the issue before the ALJ. The failure of Plaintiff to recall the CDI investigation has no connection to the testimony and supporting evidence regarding Plaintiff's pain and limitations of function. The ALJ concedes that the investigation found no evidence of wrong doing on her part and, in

fact, in many ways appears to support her claims of problems with ambulation. As the ALJ notes, the investigator saw that Plaintiff walked with a noticeable limp (Tr. 26). I conclude it was improper to disregard all Plaintiff's testimony because of her inability to initially recall an investigation that happened almost a year earlier[4] when surprised at a hearing with the accusation that her step-father allegedly had accused her of fraud[5] and that she had been investigated by the CDI for Social Security fraud. I also note that at the time the CDI officer came to Plaintiff's home, he was operating under a ruse that he was investigating identity theft. Nothing the officer said to her would have caused her to associate this investigation with her disability claim or with her step-father.

<u>The Treating Physician and Plaintiff's Bipolar Disorder</u>

Next Plaintiff argues the ALJ erred in rejecting the opinion of the treating physician, Dr. Williams. In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine plaintiffs only once. *See Kirk v. Sec'y of Health and Human Servs.,* 667 F.2d 524, 526 (6th Cir. 1981). In fact, pursuant to agency regulations, if the Commissioner finds "that a treating source's opinion on the issue(s) of the nature and severity of [a plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §404.1527(d)(2) (2011). However,

---

[4] The hearing was held in November 2007 and the CDI investigator met with the Plaintiff in November 2006.

[5] The Plaintiff's step-father adamantly denied having made these allegations (Tr. 826-830). Whether or not he played any part in the investigation, the Plaintiff was clearly quite upset and confused when this information was first revealed to her during the hearing.

23

the ALJ is not always bound to accept the treating physician's opinion.

In this case, a treating physician, Dr. Williams, gave an opinion which if accepted would be disabling. The ALJ declined to afford controlling or significant weight to Dr. Williams, in part, because Dr. Williams' opinion was based on Plaintiff's history, that is statements made by Plaintiff, and the ALJ had serious reservations about her credibility. His other basis for not affording either controlling or significant weight to Dr. Williams was that other health care providers had noted her to be de-conditioned and thus they recommended increased activity as treatment (Tr. 26). These are not valid bases to discount the treating physician in this case.

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is bound by the so-called "treating physician rule," which generally requires the ALJ to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians. *Blakley v. Commissioner,* 581 F.3d 399, 406 (6th Cir. 2009). The rationale behind the rule is that treating physicians are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence. 20 C.F.R. § 404.1527(d)(2). The ALJ must give a treating source opinion "controlling weight" if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Ibid.* Even if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it; in doing so, the ALJ must take into account the length of the treatment relationship, frequency of examination, the extent of the physician's knowledge of the impairment(s), the amount of relevant evidence supporting the physician's opinion, the extent to which the opinion

is consistent with the record as a whole, whether or not the physician is a specialist, and any other relevant factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6). *Friend v. Commissioner,* 375 Fed.Appx. 543, 550 (6th Cir. 2010).

Dr. Williams provided copies of his medical records (Tr. 624-638, 462-490) showing that he had treated the Plaintiff since at least 1991. Treatment records from multiple specialists indicate that Dr. Williams was provided with copies of their records. Dr. Williams made at least three attempts to clarify the extent of the limitations he believed the Plaintiff experienced due to her combined impairments – a Medical Opinion Form completed in 2005 (Tr. 780-782), a clarification of the Medical Opinion Form relating the limitations to prior to the Plaintiff's date last insured (DLI) (Tr. 779) and a narrative in response to the ALJ's order for clarification of his opinion (Tr. 776-777). As Plaintiff argues, the narrative provided the best information regarding the bases of Dr. Williams' opinion.[6] A complete reading of this narrative makes it clear that Dr. Williams did not base his opinion in significant part on the Plaintiff's subjective complaints:

> In regard to your order for clarification of medical opinion on Joyce Teer, I have reviewed my medical records from 2003-2005. The medical opinion form which I submitted earlier was dated June 8, 2005 and there was a question regarding whether this applied to the claimant's abilities prior to December 31, 2003.
>
> Records from Dr. David Lowry, her treating orthopedic physician, in November 2003 indicated that Ms. Teer suffered from spondylosis, lumbar scoliosis, facet arthropathy, degenerative disc disease and radiculitis of the left lower extremity. She was having quite a bit of pain and disability at that time as indicated from his notes and from my assessment. I saw her occasionally for problems related to pain from her back and leg problems and sometimes for unrelated complaints.
>
> MRI scan on August 18, 2003 had shown leftward scoliosis of 25 degree in the lumbar spine with degenerative changes, disc protrusion and osteophyte

---

[6] The ALJ admits that if "accepted at face value" the limitations imposed by Dr. Williams would impose limitations that are not consistent with sustained work at any exertional level.

formation at L5-S1 severe stenosis (narrowing) of the lateral recess and nerve root opening, findings suggesting compression of the nerve roots at lower lumbar levels and narrowing of the left L4-LS nerve root foramen (opening). Also there was bilateral facet joint hypertrophic arthritic change.

I saw the patient September 29, 2003 at which time she was having considerable pain in her left lower back and leg requiring multiple medications to attempt to control pain without complete success. I reviewed her history and the MRI report from August and suggested that she continue her follow up with Dr. Devlin who was the neurologist advising her about the nerve compression, Dr. Pearce, her back surgeon, and Dr. Catlin for epidural injections in pain management. The pain she was having, the reports from her other physicians and the MRl findings suggested to me that she would have a very difficult time attempting to work in any position that required standing for any length of time or any lifting or bending.

She came back on February 10, 2004 reporting that she had three epidural injections from Dr. Catlin, the first of which had helped considerably but the other two injections had not helped for very long. Dr. Pearce then had recommended fusion surgery in the lower spine. Her exam then revealed obvious curvature or scoliosis of the back and stiff in the lower extremities. It should be noted that she had left total hip replacement in March 2001, and right total hip replacement in June 1999. These were done by Dr. Timothy Ballard.

She was seen March 30, 2004 for increased pain in the back and left leg with any amount of walking. She had been told scoliosis had progressed. She walked in the office with a painful gait and her scoliosis was quite evident.  She described her pain as ranging between a level 6 out of 10 to a level of 10 out of 10 depending on time of day and position.

The patient underwent lumbar fusion at L3-4, L4-5, and L5-Sl in May 2004. Metal Cage devices were placed in the spine for stabilization.

I saw the patient for fluid and ankle swelling in January 2005 and for increased pain in the groin areas and hip flexor weakness in June 2005. I wrote a prescription in regard to pain but encouraged her to continue follow up with Dr. Catlin for pain management. She had a physical exam in my office July 1, 2005 in which she continued to describe pain and weakness in the hips and upper legs. My exam revealed that active range of motion in both hips was markedly limited and she was unable to raise her legs off the exam table with the legs fully straightened but was able to raise them after the legs were by the examiner raised 30 degrees. She apparently lost muscle strength in the thighs following the lumbar fusion surgery. Physical therapy was recommended and she was referred to Dr. Devlin, her neurologist for follow up evaluation.

In summary Joyce Teer has had severe disease in the lower back and legs at least since 2003, and it is difficult to see how she would have been able to engage in gainful employment involving any degree of standing, carrying, lifting, and bending from that time on for more then 1 to 3 hours of an 8 hour work day.

Tr. 776-777.

I conclude Dr. Williams' opinion is not based "in significant part" on statements made by the Plaintiff. The report mentions multiple radiographic reports, review of records from more than one treating specialist, and report of other medically acceptable signs.[7] While there are references to the Plaintiff's reports of pain, those references are accompanied by a description of examinations and review of records and testing. Symptom reporting is a part of the diagnostic process. In this case, there is no indication by Dr. Williams that the reported symptoms are felt to be excessive or malingering. There is no merit to the contention that his opinion is supported primarily by the Plaintiff's statements.

The alleged contradictions between Dr. Williams and "other health care providers" refers to notes from two physical therapists, Hans Humberger and Bo Watson (Tr. 24). Plaintiff notes physical therapists are not acceptable medical sources (*see* 20 CFR § 404.1513(a)) and, the ALJ selected comments from these reports that cover time periods ranging from June 1999 through September 2005 (Tr. 705-771) and January 2006 through March 2006 (Tr. 679-704). The comment regarding deconditioning was made in November 2003 just a few months prior to the

---

[7] 20 CFR § 404.1528

(b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
(c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

Plaintiff having surgery on her lumbar spine for severe stenosis in the lumbar spine with L5/S1 neural compression (Tr. 344). There is no mention of deconditioning again and even this reference does not indicate the lack of strength is due to deliberate or intentional failure to cooperate with treatment recommendations. As Plaintiff notes, the remainder of the physical therapy notes from both therapists report routine therapy, weakness following lumbar surgery (Tr. 713), mention her not looking well, "perhaps due to pain but she has not responded to therapy as hoped" (Tr. 749) and later in 2006 a failure to complete another round of therapy due to financial concerns (Tr. 680).

The sources cited by the ALJ to support rejection of the opinion of the treating physician did not have the long treating relationship with the Plaintiff that Dr. Williams had, nor did their records offer the same level of support or explanation that his did. Further, the isolated comments selected by the ALJ do not provide any meaningful contradiction to the well supported opinion of this long time treating physician.

Other evidence in the record include State Agency Physicians and Consultative Physicians. On November 4, 2003, Benjamin Biller, M.S., in conjunction with James Trevor Milliron, Ph.D., performed a consultative psychological examination of Plaintiff (Tr. 347-51). Mr. Biller reported that Plaintiff appeared to have a significant level of depression and anxiety (Tr. 351). He diagnosed bipolar disorder, managed with medications, and an adjustment disorder with mixed anxiety and depressed mood (Tr. 351). He opined that she appeared to have the ability to understand and remember locations and work-like procedures, understand and remember simple and/or detailed instructions, adapt to changes in the work environment and to be aware of hazards and travel unaccompanied in unfamiliar places or use public transportation

(Tr. 351). *She, however, did not appear to have the ability to sustain concentration and be persistent with work processes, due to physical pain and short-term memory problems (Tr. 351). He opined that Plaintiff's problems were primarily physical (Tr. 352). Also, she did not appear to posses the ability to interact with peers and supervisors in standardized work setting due to bipolar disorder (Tr. 351). (emphasis added).* This consultative report seemed to indicate her bipolar disorder itself would have prevented her from working.

On November 28, 2003, a state agency medical consultant reviewed the record, including Mr. Biller's report, and opined that Plaintiff had an affective disorder and an adjustment disorder, which resulted in mild limitations in daily activities and moderate limitations in social functioning and concentration, persistence, or pace (Tr. 363-375). The medical consultant completed a Mental RFC Assessment and opined that Plaintiff was able to sustain persistence and pace over extended periods for simple tasks and detailed tasks with some difficulty at times, but still could do it, and she was able to interact with the general public with some difficulty at times, but could still do it (Tr. 379). The medical consultant noted no limitations in understanding and memory or adaptation (Tr. 377-79). This appears inconsistent with the examining Psychologist's assessment by Biller and Milliron.

On November 25, 2003, Robert Burr, M.D., a state agency physician who never saw Plaintiff, reviewed the record including Plaintiff's bilateral hip replacements (Tr. 356). He opined that her complaints of pain were credible, and she would be able to lift 10 pounds occasionally and less than 10 pounds frequently; stand/walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs; balance; stoop; crouch; kneel; and crawl (Tr. 355-62).

On April 5, 2005, Joe Allison, M.D., state agency physician, who never saw Plaintiff, reviewed the evidence, including Plaintiff's history of right and left hip pain, prior to her alleged onset date, as well as various medical records from 2001 to 2004, which included Plaintiff's complaints of back pain (Tr. 414-15). He considered her statements regarding her hip pain and back pain (prior to her date last insured) to be credible and, based on such, opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand/walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs; balance; stoop; crouch; kneel; and crawl (Tr. 412-18).

On June 8, 2005, Dr. Williams submitted a medical assessment in which he listed restrictions that would render Plaintiff disabled (Tr. 621). He opined Plaintiff could sit for four hours in an eight hour day and stand or walk for two to three hours (Tr. 621). She could occasionally lift up to five pounds and infrequently (a few times a day) lift up to ten pounds (Tr. 621). She would require one hour of bedrest during a workday (Tr. 622). She would require more than one thirty minute break and two fifteen minute breaks (Tr. 622). He opined she could not be reasonably excepted to be reliable in attending an eight hour a day, forty hour a week job (Tr. 622). He opined Plaintiff's pain, medical condition, or medication would cause a lapse in concentration or memory every several hours, three or more days per week (Tr. 622). He stated that Plaintiff had significant chronic pain in the hip girdle area and back, with leg weakness and mobility problems, requiring pain medication, which seemed to preclude gainful employment (Tr. 623). Dr. Williams also indicated Plaintiff had this same level of limitation prior to her date last insured (Tr. 620).

On July 2, 2007, Dr. Williams submitted a letter clarifying his opinion (Tr. 776). He

indicated that he had considered his medical records from 2003 to 2005, records from other doctors, and test results (Tr. 776-77). He summarized that Plaintiff had severe disease in the lower back and legs since at least 2003, and it was difficult to see how she could have engaged in gainful employment (Tr. 777). He also reiterated that the limitations contained in his medical source statement related back to Plaintiff's date last insured (Tr. 776-77, 779).

I conclude the opinions of the State Agency Physicians are entitled to little or no weight in light of the fact they were given prior to, and thus without seeing, the disabling opinion of the long time treating physician, Dr. Williams. The opinion of Dr. Williams is entitled to great weight because it is supported by sufficient clinical evidence and is consistent with the evidence. This Plaintiff has had two hip replacements prior to her date last insured and shortly after that had further back surgery, the need for which was discussed prior to her date last insured. Her Bipolar disorder only complicates her situation making gainful employment not possible. I therefore conclude the ALJ's decision is not supported by substantial evidence.

Having concluded that the ALJ's decision is not supported by substantial evidence, I must now address the next course to take. When the ALJ's findings are not supported by substantial evidence, or are legally unsound, the reviewing court should reverse and remand the case for further administrative proceedings unless "the proof of disability is overwhelming or . . . the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994). Having considered the record carefully, I conclude the proof of disability is overwhelming. As stated above, Plaintiff suffers from a combination of physical and mental problems. The only opinions which support some ability to work are non-examining state agency physicians and psychologists. Those opinions are

contradictory to those who either have a long treating relationship with plaintiff and based their opinion on a substantial body of medical evidence or, in the case of the Psychological limitations, are less restrictive than state agency consultive examiners who had the opportunity to examine Plaintiff.

## IV. Conclusion

For the reasons stated herein, I RECOMMEND:

1)      The Commissioner's motion for summary judgment (Doc. 15) be DENIED,

2)      Plaintiff's motion for judgment on the record (Doc. 11) be GRANTED, and

3)      The Commissioner's decision be REVERSED, and the case REMANDED to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) for an AWARD of benefits based on a period of disability commencing on March 15, 2001.[8]


*s/William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[8]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).